# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **JOSEPH TERRELL SWINK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:17-CV-791 PLC** |
| | ) | |
| **JOSEPH MAYBERRY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court[1] on the motion for summary judgment (ECF No. 46) filed by Defendants Sergeant Joseph Mayberry, Detective Blake Carrigan, Chief Aaron Jimenez, and the City of St. Ann. Plaintiff opposes the motion. (ECF No. 57). For the following reasons, Defendants' motion for summary judgment is granted in part and denied in part.

Plaintiff filed a petition in the Circuit Court of the City of St. Louis pursuant to 42 U.S.C. § 1983 asserting claims of unreasonable stop (Count I), unreasonable arrest (Count II), and excessive force (Count III) against Mayberry and Carrigan in their individual capacities. (ECF No. 5). Plaintiff alleged that he was driving on Interstate 70 when a police pursuit of a fleeing suspect caused his vehicle to crash. Mayberry and Carrigan, who were assisting in the pursuit, mistook Plaintiff for the fleeing suspect. According to the petition, Mayberry pointed his gun at Plaintiff, ordered him to the ground, pushed his face into the asphalt, punched him in the back, and placed him in handcuffs.

Mayberry and Carrigan removed the case to federal court pursuant to 28 U.S.C. §§ 1441 and 1446. (ECF No. 1). Plaintiff subsequently filed a first amended complaint adding as

---

[1] The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c). (ECF No. 28).

Defendants the City of St. Ann ("St. Ann") and Jimenez,[2] chief of St. Ann's police department. (ECF No. 18). Plaintiff also added a claim against Jimenez in his individual capacity for "failure to follow his own policies" (Count IV) and a municipal liability claim against St. Ann and Jimenez in his official capacity (Count V).[3] (Id.).

## I.    *Legal Standard*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Hill v. Walker, 737 F.3d 1209, 1216 (8th Cir. 2013). The movant "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record]...which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant does so, the non-movant must respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial." Id. at 324 (quotation marks omitted).

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)). The court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial.

---

[2] Plaintiff's first amended complaint misspelled Jimenez's name. (ECF No. 18). Plaintiff filed a motion to amend the first amended complaint by interlineation to correct the error, and the Court granted the motion (ECF Nos. 22 & 25).

[3] "A suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity." Veatch v. Bartels Lutheran Home, 627 F.3d 1254, 1257 (8th Cir. 2010) (official capacity claims are properly dismissed as duplicative of claims against the city). See also Monell v. Dep't of Social Services, 436 U.S. 658, 690 n. 55 (1978) (A suit against a government official in his or her official capacity is "another way of pleading an action against an entity of which an officer is an agent."). Plaintiff's official-capacity claim against Jimenez and municipal liability claim against St. Ann are duplicative. The Court therefore dismisses Plaintiff's official-capacity claim against Jimenez in Count V. See, e.g., Brooks v. City of St. Louis, No. 4:17-CV-981 RLW, 2018 WL 346450, at *1-2 (E.D.Mo. Jan. 8, 2018).

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

## II. Factual background

### A. Officers' pursuit of fleeing motorist and encounter with Plaintiff

On the afternoon of January 15, 2015, Plaintiff, was driving his green Chevrolet eastbound on Interstate 70. He became aware of a silver BMW, followed by a black police car with flashing lights, traveling behind him at a high rate of speed. As the silver BMW and police car passed, Plaintiff lost control of his vehicle, which spun around, struck the median, and stopped facing westward.[4] Plaintiff exited his vehicle because he observed what appeared to be smoke emanating from the engine.

The driver of the silver BMW, Anton Simmons, was fleeing a traffic stop. Officer Stephen Downs had stopped Simmons for speeding, and a routine records check revealed that Simmons had numerous warrants. Simmons fled the stop, and Downs initiated pursuit. Downs announced over the radio that the suspect was driving a silver BMW, and "ten or more" other police cars, including those driven by Mayberry, Carrigan, and officers from the Bridgeton Police Department, joined the pursuit. Eventually, Simmons drove off the road, and police officers arrested him.

Mayberry did not hear the radio description of Simmons' vehicle. Knowing only that Downs was in pursuit of a fleeing suspect, Mayberry tried to "catch up" and assist Downs. Shortly after hearing a radio transmission about a vehicle accident in the area of I-70 and

---

[4] Plaintiff was unsure whether the silver BMW clipped his car as it sped passed him.

Cypress, which turned out to be Simmons' accident, Mayberry came upon Plaintiff's crashed vehicle.

Mistakenly believing that Plaintiff was the fleeing suspect, Mayberry pulled over and stopped in front of Plaintiff's car. Mayberry exited his vehicle with his gun drawn and pointed at Plaintiff.[5] Carrigan arrived at the scene and exited his vehicle to assist Mayberry.

At this point, the parties' versions of events diverge significantly. According to Plaintiff's deposition testimony, Plaintiff "immediately put [his] hands in the air" when he saw Mayberry approaching with his gun drawn. Plaintiff stated he did not hear any verbal commands, but, keeping his hands up, he slowly lowered himself, first to his knees, and then "completely flat on the ground." Plaintiff testified: "Within the matter of seconds, I felt a knee up against my face . . . and he began to basically press his knee harder and harder against my face." Plaintiff stated that he then felt four or five "punches" in his mid-back.

Plaintiff testified that the first thing he remembered hearing was an officer ordering him to "stop resisting." Plaintiff yelled back, "I'm not resisting; I'm not resisting," and the officer ordered him to "shut up."

Mayberry, on the other hand, stated in his deposition that, Plaintiff "got out of his vehicle and fled from the vehicle." Mayberry stated that, as Plaintiff attempted to run away from him, he used an "arm bar technique" to take Plaintiff to the ground. According to Mayberry, he placed his knee on Plaintiff's mid-back, wrested Plaintiff's arms out from under him, and placed Plaintiff in handcuffs.

Like Mayberry, Carrigan testified that Plaintiff resisted Mayberry's efforts to apply the handcuffs, and Mayberry "straddled" Plaintiff's back "to restrict his movement." Carrigan

_____

[5] Mayberry stated in his deposition that he "would have had [his gun] at a low ready, which would have been around his feet," but he conceded "it may have come up when I was approaching him." (Mayberry depo at 40, 42).

4

explained that, in an effort to help Mayberry restrain Plaintiff, he "put [his] left shin across . . . [Plaintiff's] back, basically, in between his shoulder blades" so that he and Mayberry were "face-to-face trying to . . . get handcuffs on [Plaintiff]." Carrigan stated he also placed his left hand "around the back of [Plaintiff's] neck because he feared Plaintiff was "going to bite [him]." Both Mayberry and Carrigan denied using their body weight to push Plaintiff's face into the asphalt and punching Plaintiff.

At his deposition, Jimenez testified that he arrived at the scene and observed Mayberry pointing his gun at Plaintiff who "was running towards the back of the car," and away from Mayberry. By the time Jimenez exited his vehicle, "two or three detectives were already detaining [Plaintiff]."

The parties do not dispute that, once Plaintiff was in handcuffs, Mayberry returned to his vehicle and turned off the sirens. At this point, he heard a radio broadcast communicating that officers had arrested the fleeing suspect. Mayberry informed the other officers that they "had the wrong guy," and they released Plaintiff. Plaintiff traveled by ambulance to the emergency room at DePaul Hospital where doctors removed debris that was embedded in the right side of Plaintiff's face and stitched the area near his right ear.

### B. St. Ann's vehicular pursuit policy

St. Ann's vehicular pursuit policy in effect at the time of the incident, provided: "The initiation or continuation of a pursuit is authorized only when the necessity of an immediate apprehension of a suspect outweighs the level of risk associated with the pursuit." The pursuit policy therefore required officers to consider the specific circumstances and conditions "before initiating a pursuit and [] continually reevaluate changing circumstances during a pursuit to determine if the pursuit should continue." Factors for officers to consider before and during a

pursuit included, among others, the: "seriousness of the original offense that led to the pursuit"; "likelihood of identifying the suspect at a later date"; "speeds of the suspect and law enforcement vehicles"; "speed, direction(s), and density of vehicular and pedestrian traffic"; and "quality and reliability of communications between involved officers and other affected agencies." The pursuit policy directed officers to "immediately terminate the pursuit" if "[c]hanging circumstances or conditions indicate the risk to public safety associated with continued pursuit are greater than the public safety benefit of making an immediate apprehension."

Pursuant to the pursuit policy, "[n]o more than a total of two law enforcement vehicles should be in direct pursuit of a fleeing vehicle" unless aggravating circumstances, such as pursuits involving violent felons or multiple suspects, justify additional patrol vehicles. "Involvement in a pursuit with more than two law enforcement vehicles should be approved by a supervising commander."

The pursuit policy set forth the responsibilities of the officers involved in a pursuit. The officer initiating a pursuit must "immediately notify dispatch" and report: the reason for the pursuit; description and license information of the fleeing vehicle; location, direction of travel, and approximate speed of vehicle; description and number of occupants; and other pertinent information, such as traffic, weather, or road conditions. That initiating officer is the "primary pursuit officer until another officer assumes responsibility." The primary officer "should terminate the pursuit if the identity of the driver is known and the apprehension of the driver is not immediately necessary" and must communicate "complete, accurate and timely information to communications personnel throughout the pursuit." The secondary pursuit officer must notify communications personnel when joining the pursuit.

In regard to supervision of vehicular pursuits, the pursuit policy provided: "On-duty supervisory personnel should actively attempt to monitor and guide events associated with the pursuit." The supervisor's responsibilities included:

1. Making necessary inquir[i]es to immediately determine relevant circumstances surrounding the pursuit.
2. Ordering the termination of the pursuit if it appears to constitute an unreasonable risk to public safety, officer safety or it is not being conducted [i]n accordance with this order.
3. Limiting type and number of patrol car[s] that are directly or indirectly involved.
4. Approving or disapproving pursuit tactics, to include forcible stopping techniques.
5. Continuously reevaluating the pursuit according to the criteria stated in this order and ordering the termination of the pursuit when the pursuit appears to constitute an unreasonable risk to public safety.

Following a pursuit, the officer who was the primary officer for all or most of the pursuit, must "submit a Pursuit Report." Each pursuit report must: "summarize the circumstances surrounding the pursuit" and "document all unusual situations or hazards and explain how the need to immediately apprehend the suspect outweighed the risks posed to the public." The officer that supervised the pursuit should review the pursuit report "for completeness, accuracy and compliance with all applicable directives."

### C.  Officer communication and supervision during pursuit

Mayberry and Carrigan learned on the police department's point-to-point radio channel that Downs was pursuing a suspect that fled a traffic stop and they were travelling northbound on Lindbergh.  Neither officer heard the transmission describing the silver BMW that Simmons was driving, and neither officer announced on the radio his decision to assist Downs.  At his deposition, Mayberry testified that there were two to four police cars involved in the pursuit

ahead of him, and Carrigan stated that "ten or more officers" were "driving along on [Interstate] 70 with the intention of being part of catching [Simmons]."[6]

At the time of the pursuit, Jimenez was working at his desk and observed his officers run out of the station. After he called dispatch and learned of the pursuit, Jimenez "got in [his] car and then went to the highway." Jimenez did not recall hearing a description of the fleeing suspect's vehicle or the reasons for his arrest warrants. Nor did Jimenez recall hearing an officer evaluate the factors relevant to the decision to continue or terminate the pursuit. Jimenez stated in his deposition: "I was monitoring that radio, there was so much commotion, I wasn't processing anything that – there was just so much chatter on there." When Jimenez reached the scene of Plaintiff's car accident, he "figured because [Mayberry] had his gun drawn on [Plaintiff] . . . that he had gotten the right suspect in custody . . . ."

Although Jimenez was on the radio, he did not actively supervise the pursuit. In his deposition, Jimenez acknowledged that, under the pursuit policy, involvement of more than two officers in a pursuit required the approval of a supervising command officer, and conceded, "I don't think there was any involvement of a command officer in making decisions [during this pursuit]." Jimenez also stated that the practice of St. Ann's police department was to "initiate a pursuit . . . every time" a driver fled a traffic stop before it was complete.[7]

### D. Pursuit report

No officer from St. Ann's police department submitted a pursuit report for the January 15, 2015 pursuit of Simmons. Jimenez stated in his deposition that one of the arresting officers

---

[6] Downs stated in his deposition that twelve or thirteen police cars involved in the pursuit were ahead of him when Simmons drove off the road.

[7] Later in his deposition, Jimenez revised that statement, stating that his officers pursued fleeing drivers eighty-five percent of the time.

completed an "offense incident report"[8] for the Simmons arrest, but conceded that the incident report did not conform to the Policy's requirements for pursuit reports. Specifically, the incident report did not describe the circumstances and conditions relevant to the officers' decision to pursue the fleeing suspect or explain the need for more than two pursuing officers. In regard to his failure to complete a pursuit report, Downs stated at his deposition that he "forgot" to write one because he was "extremely busy." Following this incident, Jimenez did not discipline any of St. Ann's officers for their failure to comply with the pursuit policy.

In February 2015, Lieutenant William Hunt, St. Ann's accreditation manager for the Commission on Accreditation for Law Enforcement (CALEA), completed at Jimenez's direction, a report of St. Ann's police pursuits based on data from 2014 and 2015. According to Hunt's report, which Jimenez submitted to the CALEA, 14.3 percent of pursuits in 2014 and 25 percent of pursuits in 2015 "ended with an injury accident" and there was "1 property damage incident involving a third party not involved in the pursuit from 2014." At his deposition, Hunt acknowledged that the report did not include the January 15, 2015 pursuit at issue in this case.

### III. *Defendants' Motion for Summary Judgment*

Defendants move for summary judgment on each of Plaintiff's five counts. (ECF No. 46). The Court considers each count below.

#### A. *Counts I & II: Unlawful stop and arrest (against Mayberry and Carrigan)*

Mayberry and Carrigan move for summary judgment on Plaintiff's claims that they unlawfully stopped and arrested him on the ground that: (1) the undisputed material facts establish there was no Fourth Amendment violation; and (2) Mayberry and Carrigan are entitled to qualified immunity. (ECF No. 47). Plaintiff counters that his seizure by Mayberry and Carrigan constituted a violation of his rights under the Fourth Amendment. Plaintiff further

---

[8] This incident report does not appear in the summary judgment record.

asserts that Mayberry and Carrigan are not entitled to qualified immunity because their mistaken belief that Plaintiff was the fleeing suspect was unreasonable.  (ECF No. 56).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)).  "In analyzing a claim of qualified immunity, [a court] may examine the two key prongs . . . in either order."  Moore v. City of Desloge, Mo., 647 F.3d 841, 846 (8th Cir. 2011) (citing Camreta v. Greene, 563 U.S. 693, 705 (2011).

"For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what [the official] is doing violates that right.'"  Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent."  Id. (quoting Anderson, 483 U.S. at 640) (citations omitted).  See also Brosseau v. Haugen, 543 U.S. 194, 198 (2004) ("Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.").

The parties do not dispute that Mayberry stopped Plaintiff for the purpose of arresting him.[9] "It is well-established that a warrantless arrest without probable cause violates an individual's constitutional rights under the Fourth and Fourteenth Amendments." Schaffer v. Beringer, 842 F.3d 585, 592 (8th Cir. 2016) (quoting Walker v. City of Pine Bluff, 414 F.3d 989, 992 (8th Cir. 2005)). An officer has probable cause "when the totality of facts known at the time of the arrest would justify a reasonable person in believing that the individual has committed or is committing an offense." Hosea v. City of St. Paul, 867 F.3d 949, 955 (8th Cir. 2017).

Mayberry and Carrigan do not argue they had probable cause to arrest Plaintiff. Rather, they maintain that, because they had probable cause to arrest the fleeing suspect and their mistaken belief that Plaintiff was the fleeing suspect was reasonable, they are entitled to qualified immunity. "[T]he issue for [qualified] immunity purposes is not probable cause in fact but arguable probable cause, that is whether the officer should have known that the arrest violated plaintiff's clearly established right."[10] Schaffer, 842 F.3d at 592 (quoting Habiger v. City of Fargo, 80 F.3d 289, 295 (8th Cir. 1996)). "The probable cause standard inherently allows room for reasonable mistakes by a reasonable person, but the qualified immunity standard affords law enforcement officials an even wider berth for mistaken judgments 'by protecting all

---

[9] Because the probable cause required for an arrest is a higher threshold than the reasonable suspicion required for an investigatory stop, Terry v. Ohio, 392 U.S. 1 (1968), the Court will first consider Mayberry and Carrigan's motion for summary judgment on Plaintiff's § 1983 claims in Count II. "[I]f an officer has probable cause, any inquiry into other acceptable justifications for the seizure is largely superfluous . . . ." Schaffer v. Beringer, 842 F.3d 585, 592 (8th Cir. 2016) (quoting United States v. Pratt, 355 F.3d 1119, 1122 (8th Cir. 2004)).

[10] "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing [the arrest] is based in probable cause if the mistake is 'objectively reasonable.'" Ehlers v. City of Rapid City, 846 F.3d 1002, 1009 (8th Cir. 2017) (quoting Borgman v. Kedley, 646 F.3d 518, 523 (8th Cir. 2011)). See also Williams v. Decker, 767 F.3d 734, 742 (8th Cir. 2014) ("[T]he defense of qualified immunity applies if officers arrest a suspect under the mistaken belief that they have probable cause to do so – provided that the mistake is objectively reasonable." (internal quotation omitted)).

but the plainly incompetent or those who knowingly violate the law.'" Ulrich v. Pope Cty., 715 F.3d 1054, 1059 (8th Cir. 2013) (quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)).

Mayberry and Carrigan maintain that: (1) they had, at least, arguable probable cause to arrest the fleeing suspect; and (2) their mistaken belief that Plaintiff was the fleeing suspect was reasonable. Plaintiff concedes that the officers had probable cause to arrest Simmons after he fled the traffic stop. (ECF No. 56 at 13). Whether Mayberry's mistaken belief that Plaintiff was the fleeing motorist was reasonable is a closer question.

Viewing the facts in the light most favorable to Plaintiff and giving him the benefit of all reasonable inferences, the record reveals that, at the time of the pursuit, Mayberry was monitoring two radio channels, when he heard the pursuit and its location announced on the radio. Multiple police cars joined the pursuit and there was considerable "chatter" and "commotion" on the radio. Although neither Mayberry nor Carrigan heard a description of Simmons or the silver BMW he was driving, they decided to assist the pursuit.

Plaintiff was driving his green Chevrolet Malibu east on Interstate 70 at the time of the pursuit. As Simmons sped by Plaintiff, he either clipped Plaintiff's car or caused Plaintiff to swerve and lose control. Plaintiff's car spun around, crashed into the median, and stopped facing westward, or backwards, on the shoulder of the highway. Plaintiff exited the car because the engine was emitting smoke or steam and he feared a fire.

Mayberry heard over the radio the report of a vehicle accident on I-70 near Cypress. The report did not state whether that accident involved Simmons. Within seconds of hearing the report, Mayberry arrived at the scene of Plaintiff's accident. When he stopped his police car directly in front of and facing Plaintiff's car, Plaintiff was walking toward the rear of his car to assess the damage. Assuming that Plaintiff was the fleeing motorist, Mayberry immediately

exited the police car, pointed his firearm at Plaintiff, and arrested Plaintiff because he believed he was the fleeing suspect. Upon learning that Plaintiff was not the suspect, Mayberry and the other officers released him.

The Court is mindful that Plaintiff's arrest occurred in the midst of a fast-paced and chaotic vehicular pursuit. Knowing only that a suspect was fleeing arrest, officers were pursuing the suspect, and an accident had occurred, Mayberry assumed Plaintiff was the suspect. Given the speed at which the event transpired, the chaos on the radio, the proximity of Plaintiff's accident to the actual pursuit, and the announcement of an accident in that area, Mayberry's mistake was not objectively unreasonable.[11] The Court therefore finds that Mayberry is entitled to qualified immunity on Plaintiff's §1983 claims for unlawful stop (Count I) and arrest (Count II).

The Court separately considers whether Carrigan is also entitled to qualified immunity on those claims. Carrigan was at a store investigating a theft when he heard the radio announcement that Downs had initiated pursuit of a fleeing suspect. Carrigan returned to his patrol car and headed toward the pursuit. As Carrigan approached the scene of Plaintiff's accident, he saw Mayberry pointing his firearm at Plaintiff and believed Plaintiff was the fleeing suspect. He therefore stopped his vehicle and assisted in the arrest.

"Generally, an assisting officer is entitled to rely on the probable cause determination of the arresting officer and may receive qualified immunity as long as the reliance is reasonable."

---

[11] In the context of a §1983 action for a violation of substantive due process arising from a high-speed police chase, the Supreme Court observed: "A police officer deciding whether to give chase must balance on one hand the need to stop a suspect and show that flight from the law is no way to freedom, and, on the other, the high-speed threat to all those within stopping range, be they suspects, their passengers, other drivers, or bystanders." County of Sacramento v. Lewis, 523 U.S. 833, 853 (1998) (high-speed chases with no intent to physically harm suspects do not give rise to liability under § 1983 for violations of substantive due process).

Ehlers, 846 F.3d at 1010 (citing Doran v. Eckold, 409 F.3d 958, 965 (8th Cir. 2005)). See also Mitchell v. Shearrer, 729 F.3d 1070, 1073 (8th Cir. 2013) ("There is no evidence to suggest that [the assisting officers] were involved in the decision to arrest [the plaintiff] or that they knew or should have known that the seizure was unlawful."). Nothing in the record suggests that Carrigan's reliance on Mayberry's decision to arrest Plaintiff was unreasonable. Accordingly, Carrigan is entitled to qualified immunity on Plaintiff's claims of unlawful stop (Count I) and arrest (Count II).

Because Mayberry had arguable probable cause to arrest Plaintiff and Carrigan reasonably relied on Mayberry's arrest decision, they are entitled to qualified immunity with respect to Plaintiff's Counts I and II. The Court therefore grants Mayberry and Carrigan summary judgment on Plaintiff's claims for unlawful stop and arrest under § 1983.

### B. Count III: Excessive force (against Mayberry & Carrigan)

Mayberry and Carrigan move for summary judgment on Plaintiff's § 1983 claim for excessive force, arguing that the amount of force they used during the arrest was "minimal and appropriate." (ECF No. 46). Mayberry and Carrigan further argue that, even if the Court finds that their use of force violated Plaintiff's Fourth Amendment rights, they are entitled to qualified immunity because "the law was not clearly established that the Fourth Amendment prohibited the minimal force used in taking Plaintiff briefly into custody under the circumstances with which they were confronted." (Id.). Plaintiff counters that the officers violated his clearly established right to be free from excessive force when: (1) Mayberry pointed a gun at him; and (2) either Mayberry or Carrigan used his knee to grind Plaintiff's face into the asphalt. (ECF No. 56). The Court will consider separately the two discreet acts of force.

"Police officers undoubtedly have a right to use some degree of physical force, or threat thereof, to effect a lawful seizure, and reasonable applications of force may well cause pain or minor injuries with some frequency." Chambers v. Pennycook, 641 F.3d 898, 907 (8th Cir. 2011) (internal citation omitted). "The right to be free from excessive force in the context of an arrest is[, however,] a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures." Ngo v. Storlie, 495 F.3d 597, 604 (8th Cir. 2007).

"In determining whether a particular use of force was excessive, [a court] considers whether it was objectively reasonable under the circumstances, 'rely[ing] on the perspective of a reasonable officer present at the scene rather than the 20/20 vision of hindsight.'" Perry v. Woodruff Cty. Sheriff Dep't, 858 F.3d 1141, 1145 (8th Cir. 2017) (quoting Carpenter v. Gage, 686 F.3d 644, 649 (8th Cir. 2012) (internal quotation omitted)). To ascertain the objective reasonableness of the use of force under the circumstances, a court considers: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" Id. (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). Importantly, a plaintiff need not "show more than *de minimis* injury to establish an application of excessive force." Chambers, 641 F.3d at 907 (clarifying a previously "open question in this circuit whether an excessive force claim requires some minimum level of injury.").

### i. *Drawing firearm*

The Court first considers Plaintiff's claim that, even if the seizure was reasonable, it was not reasonable for Mayberry to immediately draw his firearm and point it at Plaintiff. "An officer is justified in drawing his weapon when he is justifiably concerned for his safety and has not yet been able to ascertain whether the person being seized is armed or poses a danger to

himself or others." <u>Kaleta v. Johnson</u>, No. 12-170-JNE-FLN, 2013 WL 3448148, at *6 (D. Minn. July 9, 2013) (citing <u>Howard v. Kansas City Police Dep't</u>, 570 F.3d 984, 989 (8th Cir. 2009)).  For example, the Eighth Circuit has held that officers responding to a report of a shooting and high-speed car chase did not use unreasonable force when, upon arriving at the scene, they drew their weapons and forced the plaintiff, the victim of the shooting and subject of the car chase, to the ground.  <u>Howard</u>, 570 F.3d at 989.  The court reasoned that "even though [the plaintiff] approached them trying to get their assistance, it was necessary for the Officers to ensure their safety until they could ascertain [the plaintiff's] role in the incident and determine whether he was armed." <u>Id.</u>  <u>See also</u> <u>McCoy v. City of Monticello</u>, 342 F.3d 842, 848 (8th Cir. 2003) (officer justified in drawing firearm after stopping driver who was driving erratically and did not immediately stop and pull over when officer activated his squad car's sirens and lights); <u>Edwards v. Giles</u>, 51 F.3d 155, 157 (8th Cir. 1995) (officer did not use excessive force when he pointed his gun at the plaintiff whom the officer believed committed a felony and had fled from police and hid from the officer to avoid capture); <u>Clark v. Clark</u>, No. 1:16-CV-94-AGF, 2018 WL 513590, at *6-7 (E.D. Mo. Jan. 23, 2018).

Based on the totality of the circumstances and viewing the facts in a light most favorable to Plaintiff, the Court concludes that a jury could not properly find Mayberry's act of drawing and pointing his firearm was objectively unreasonable.  Before exiting his police car, Mayberry had the following information:  Downs stopped a driver for a traffic violation and learned that the driver had "multiple" arrest warrants.  The driver fled the stop, Downs initiated pursuit, and a car accident occurred.  Also, it is undisputed that, when Mayberry stopped the car, Plaintiff was moving in the opposite direction and, due to the sirens and highway traffic, Plaintiff did not hear Mayberry's verbal commands.

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396–397. As previously discussed, in the fast pace at which the incident transpired and the confusion of that particular moment, Mayberry's mistaken belief that Plaintiff was the fleeing motorist was not objectively unreasonable. As such, Mayberry's conduct in pointing his firearm at Plaintiff was reasonable and did not constitute a violation of Plaintiff's rights under the Fourth Amendment. "Any other interpretation of this record is gleaned from 20/20 hindsight as opposed to judging the circumstances from the perspective of a reasonable officer following customary police practices." McCoy, 342 F.3d at 849 (citing Graham, 490 U.S. at 396). Mayberry is therefore entitled to summary judgment on Plaintiff's claim that pointing his gun at Plaintiff constituted excessive force.[12]

### ii. Physical force used to effect arrest

Mayberry's or Carrigan's alleged use of his knee on Plaintiff's head, however, presents a discrete use of force for consideration under the Fourth Amendment. See, e.g., Blazek v. City of Iowa City, 761 F.3d 920, 925 (8th Cir. 2014). Viewing the record in the light most favorable to Plaintiff and giving him the benefit of all reasonable inferences, upon noticing Mayberry pointing his firearm at him, Plaintiff immediately ceased walking and "put his hands up."

---

[12] The Court recognizes that, under other circumstances, pointing a gun at a suspect may violate the Fourth Amendment. See Cunningham v. Hinrichs, No. 4:12-CV-785-CEJ, 2013 WL 6068881, at *4 (E.D. Mo. Nov. 18, 2013) ("[T]he facts as shown by plaintiff – that plaintiff was fully cooperative, clearly unarmed, and neither fled nor resisted, and that the officers pointed a gun at him, pushed and held him to the ground, and forcibly handcuffed him – do make out a violation of plaintiff's rights to be free from unreasonable seizure and the use of excessive force."). See also Mlodzinski v. Lewis, 648 F.3d 24, 38 (1st Cir. 2011); Baird v. Renbarger, 576 F.3d 340, 344-47 (7th Cir. 2009); Robinson v. Solano Cty., 278 F.3d 1007, 1013-15 (9th Cir. 2002) (en banc); Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1192-93 (10th Cir. 2001).

Plaintiff then voluntarily lowered himself to the ground so he was lying on his stomach with the right side of his face on the ground and his hands in front of him.

The first physical contact with an officer, was "a knee up against [his] face." Either Mayberry or Carrigan "pressed his knee harder and harder against [Plaintiff's] left, upward cheek[.]" While Plaintiff's face was pressed against the ground, an officer punched him in the back four or five times and placed him in handcuffs. As this was happening, Plaintiff repeatedly yelled "I'm not resisting; I'm not resisting." Plaintiff also tried to explain "who I was and where I was coming from," but the officer with his knee on Plaintiff's head ordered him to "shut up." As a result of the force applied against Plaintiff's head, he "ended up with asphalt embedded in his face (right cheek) and a stitch or stitches to his ear[.]"[13]

"[T]he use of force against a suspect who was not threatening and not resisting may be unlawful." Shannon v. Koehler, 616 F.3d 855, 864 (8th Cir. 2010) (unreasonable for police officer to aggressively take the plaintiff to the ground simply because the plaintiff used profanity and might have poked him in the chest with his finger). "It is the province of the jury to assess the credibility of the evidence, and if the jury accepts [Plaintiff's] account, it could fairly conclude" that Mayberry and Carrigan used excessive force against him when they "ground" his face into the asphalt. Brown v. City of Golden Valley, 574 F.3d 491, 500 (8th Cir. 2009). See,

---

[13] Mayberry and Carrigan appear to suggest that the amount of force was "not only legally justified, but was also not excessive" because Plaintiff's "facial injury consisted of abrasions that were treated in the Emergency Room with cleaning and removal of the debris, application of ointment, and one stitch in his right ear lobe area[.]" However, "there is no uniform requirement that a plaintiff show more than a *de minimis* injury to establish an application of excessive force." Chambers, 641 F.3d at 907. The excessive-force inquiry "must focus on the force applied and *not* its end result, that is, the level of injury." McClennon v. Kipke, 821 F.Supp.2d 1101, 1106 (D. Minn. 2011) (emphasis added) (citing Chambers, 641 F.3d at 906). By focusing on the degree of injury Plaintiff suffered, Mayberry and Carrigan "skip[] over the question whether the use of any force was appropriate in this instance." Hemphill v Hale, No. 4:09-CV-2123 CEJ, 2011 WL 4014371, at *3 (E.D. Mo. Sept. 9, 2011), aff'd, 677 F.3d 799 (8th Cir. 2012).

e.g., Hemphill v Hale, No. 4:09-CV-2123 CEJ, 2011 WL 4014371, at *3 (E.D. Mo. Sept. 9, 2011), aff'd, 677 F.3d 799 (8th Cir. 2012); Miller v. Albright, No. 4:07-CV-1086 CAS, 2009 WL 4573295, at *5 (E.D. Mo. Dec. 3, 2009). Furthermore, the law was sufficiently developed to show that such a violation – allegedly involving unnecessary violence against a suspect who is not showing a weapon and is complaint – would contravene clearly established law as of 2015. See Shannon, 616 F.3d at 863-64 (affirmed district court's denial of qualified immunity and found "clearly established" that "the use of force against a suspect who was not threatening and not resisting may be unlawful.") The Court therefore denies Mayberry's and Carrigan's motion for summary judgment on Count III on the basis of qualified immunity, to the extent the claim arises out of their use of a knee on Plaintiff's head.

### C. Count IV: Failure to follow policies (against Jimenez in his individual capacity)

Jimenez moves for summary judgment on Plaintiff's claim that Jimenez violated his constitutional rights by failing to follow his police department's pursuit policy. Specifically, Jimenez asserts that he "had no involvement in the initial pursuit as it had already terminated by the time he reached the scene." (ECF No. 47 at 22). Alternatively, Jimenez claims he is entitled to qualified immunity because "he did not participate nor was he present for the arrest of Plaintiff by [Mayberry] or [Carrigan] or any use of force by either [of those] Defendant[s] while taking Plaintiff into custody."[14] (Id. at 23). Plaintiff counters that Jimenez is liable for the allegedly unconstitutional seizure of Plaintiff because Jimenez "actively participated in the pursuit."[15] (ECF No. 56).

---

[14] In his motion for summary judgment, Jimenez argues that he is entitled to qualified immunity because the law was not clearly established that "his limited supervisory involvement and designation of an on-duty supervisor as watch commander was prohibited[.]" (ECF No. 46).

[15] Plaintiff does not assert that Jimenez is individually liable for Mayberry's and Carrigan's use of excessive force. (ECF No. 56 at 23) ("Plaintiff does not assert that Chief Jimenez was

A supervisor sued in his or her individual capacity in a § 1983 suit "is only liable for his or her own misconduct." Ashcroft v. Iqbal, 566 U.S. 662, 677 (2009); see also S.M. v. Krigbaum, 808 F.3d 335, 340 (8th Cir. 2015) ("Government officials are personally liable only for their own misconduct."). The record reveals that Jimenez was working at the police station when he saw officers leaving and determined there was a vehicular pursuit in progress. At his deposition, Jimenez acknowledged that he proceeded to the highway without hearing descriptions of the suspect, the car, or the violation underlying the suspect's arrest warrants. Jimenez also stated that he neither actively supervised the pursuit over the radio nor heard another supervisor analyzing whether the pursuit should be terminated. When Jimenez arrived at the scene of Plaintiff's accident, he saw Mayberry pointing his gun at Plaintiff. Jimenez testified at his deposition that "I figured because [Mayberry] had his gun drawn . . . that he had gotten the right suspect in custody . . . ." By the time Jimenez exited his car and reached Plaintiff, "there were two or three detectives that were already detaining [him]."

Nothing in the record suggests that Jimenez unconstitutionally directed or otherwise participated in the unconstitutional seizure of Plaintiff before he arrived at the scene of Plaintiff's arrest. When Jimenez arrived, two or three officers were already restraining Plaintiff and placing him in handcuffs. Furthermore, assuming *arguendo*, that Jimenez may be held liable under § 1983 for the alleged seizure of Plaintiff, the doctrine of qualified immunity would protect Jimenez from liability. As previously discussed in relation to Plaintiff's unlawful seizure claims against Mayberry and Carrigan, the doctrine of qualified immunity protects a law enforcement officer from liability for an unconstitutional arrest "if the arrest was supported by at least

---

responsible for the force used by Mayberry and Carrigan because as stated in Baltimore v. City of Albany, Ga., 183 Fed. App'x 891, 897 (11th Cir. 2006). . . absent evidence that officers on the scene had warning that the arresting officer was going to kick the arrestee in the head, they had no duty to prevent the alleged deadly force.").

'arguable probable cause.'" Williams, 767 F.3d at 742 (quotation omitted). "[T]he defense of qualified immunity applies if officers 'arrest a suspect under the mistaken belief that they have probable cause to do so – provided that the mistake is objectively reasonable.'" Id. (quoting Smithson v. Aldrich, 235 F.3d 1058, 1062 (8th Cir. 2000)). Given the "tense, uncertain, and rapidly evolving" circumstances, the officers' mistaken belief that Plaintiff was the fleeing motorist was objectively reasonable.

Plaintiff cites, without discussion, the Eighth Circuit's decision in Parrish v. Ball for the proposition that "a supervising officer can be liable for an inferior officer's constitutional violation only '. . . . if his failure to . . . supervise the offending actor caused the deprivation.'" 594 F.3d 993, 1001 (8th Cir. 2010) (quoting Otey v. Marshall, 121 F.3d 1150, 1155 (8th Cir. 1997). "When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to . . . supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." S.M., 808 F.3d at 340. Plaintiff makes no such showing. The Court therefore grants Jimenez summary judgment on Plaintiff's Count IV.

D. *Count V: Monell claim (against St. Ann)*

St. Ann asserts it is entitled to summary judgment on Plaintiff's § 1983 claim of municipal liability because Plaintiff presented no evidence that the allegedly unlawful arrest or use of excessive force arose from any alleged municipal custom or practice of St. Ann. In response, Plaintiff asserts that a reasonable jury could find St. Ann liable because the actions of

Jimenez, as St. Ann's final policymaker regarding pursuits,[16] caused the deprivation of Plaintiff's constitutional rights.

A municipality may be liable under § 1983 for a violation of an individual's constitutional rights if the violation resulted from: (1) an official municipal policy; (2) an unofficial custom; or (3) a deliberately indifferent failure to train or supervise. City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). (ECF No. 18 at 32). In the wherefore paragraph of Count V, Plaintiff explicitly seeks relief based on St. Ann's "custom and practice." Therefore, the Court limits its analysis of St. Ann's municipal liability to consideration of its "custom and practice."[17]

A 'custom' is an unofficial practice characterized by a "continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees." Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999). To establish municipal liability based on a custom, a plaintiff bears a "heavy burden" to demonstrate: (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the municipality's policy-making officials after notice to the officials of the misconduct; and (3) that the plaintiff was injured by acts pursuant to the municipality's custom, meaning that the custom was the moving force behind the constitutional violation. Mick v. Raines, 883 F.3d 1075, 1079 (8th Cir. 2018) (citing Mettler, 165 F.3d at 1200).

---

[16] The parties do not dispute that Jimenez was a final policymaker for purposes of § 1983 municipal liability.

[17] In particular, Plaintiff seeks damages from St. Ann for harm caused by St. Ann's alleged custom and practice of: (1) not supervising pursuits; (2) not obtaining pursuit reports; (3) not including in its "2015 St. Ann P.D. Pursuit Analysis" any pursuit for which a report was not written; and (4) not disciplining officers' violations of the pursuit policy.

In support of his municipal liability claim, Plaintiff presents only Lt. Hunt's "2015 St. Ann P.D. Pursuit Analysis," which collected and analyzed data from pursuit reports completed in 2014 and early 2015. The report contains statistical information relating to the: number of pursuits, time of day of pursuits, traffic and weather conditions during pursuits, speed of pursuits, primary reasons for initiating and terminating pursuits, and property damages and/or injury resulting from pursuits. In regard to supervision, the report stated: "The primary reason for termination of a pursuit in 2014 was a supervisor ordering the termination. In 2015 the primary reason for termination was tied between a supervisor ordering the termination of the pursuit and the suspect surrendering." The report does not explicitly set forth the presence or absence of supervision during the pursuits or any official discipline occurring or not occurring after the pursuits. Nor does the report address in any manner pursuits occurring without a follow-up pursuit report or any discipline of a police officer occurring or not occurring when a pursuit report was not written. Finally, the report does not clearly disclose any pursuits resulting in an unlawful arrest of a mistakenly identified person or an excessive use of force.

Plaintiff's evidence does not show a "continuing, widespread, persistent pattern" of unconstitutional misconduct by St. Ann police officers. Other than the single incident at issue in this case, Plaintiff presents no evidence of vehicular pursuits by St. Ann police officers resulting in the alleged constitutional violations at issue in this case, – namely, unlawful arrest based on mistaken identity and use of excessive force. "[G]enerally, an isolated incident of alleged . . . misconduct . . . cannot, as a matter of law, establish a municipal policy or custom creating liability under § 1983." Corwin v. City of Independence, Mo., 829 F.3d 695, 700 (8th Cir. 2016) (quoting Ulrich, 715 F.3d at 1061).

Even assuming *arguendo* that Plaintiff can demonstrate a custom and practice of unconstitutional misconduct, Plaintiff's evidence does not demonstrate that St. Ann was deliberately indifferent to or tacitly authorized any custom or practice of failing to: supervise pursuits; obtain pursuit reports; include in a review of pursuits any pursuit for which a pursuit report was not written; or discipline officers who violate the pursuit policy. "Notice is the touchstone of deliberate indifference in the context of § 1983 municipal liability." Atkinson, 709 F.3d at 1216. Accordingly, "[t]o make a cognizable claim under this theory, Plaintiff must 'show that [St. Ann] had notice of prior incidents of police misconduct and had deliberately failed to act on this knowledge." Rohrbough v. Hall, No. 4:07-CV-996 ERW, 2008 WL 4722742, at *11 (E.D.Mo. Oct. 23, 2008) (quoting Harris v. City of Pagedale, 821 F.2d 499, 504 (8th Cir. 1987)). Plaintiff submitted no evidence that St. Ann received notice of the police department's alleged failure to supervise pursuits or engage in the other conduct allegedly supporting Plaintiff's municipal liability claim.

The undisputed evidence before the Court does not demonstrate that there was an unofficial custom or practice for St. Ann police officers to engage in pursuits without supervision or to engage in the other allegedly unconstitutional conduct regarding pursuits on which Plaintiff bases his municipal liability claim. The Court therefore grants summary judgment in favor of St. Ann on Plaintiff's § 1983 municipal custom claim in Count V.

### IV. Conclusion

For the reasons set forth above, the Court grants Defendants summary judgment on Plaintiff's § 1983 claims in Counts I, II, IV and V. The Court denies Defendants' motion for summary judgment on Plaintiff's Count III, except to the extent Plaintiff bases his excessive force claim on Mayberry's act of drawing his gun on Plaintiff.

**IT IS HEREBY ORDERED** that Plaintiff's official-capacity claim against Jimenez in Count V is **DISMISSED**.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment (ECF No. 46) is **GRANTED** with respect to Counts I, II, IV, and V.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment (ECF No. 46) is **GRANTED** to the extent the claim is based on Mayberry drawing his gun on Plaintiff and is otherwise **DENIED**.

**IT IS FINALLY ORDERED** that, with respect to the remaining excessive force claim against Mayberry and Carrigan in Count III, the final pretrial conference in this case remains set for July 5, 2018, trial remains set for July 9, 2018, and the pretrial materials remain due as set forth in the Court's order of June 11, 2018 (ECF No. 67).

_Patricia L. Cohen_
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 18th day of June, 2018